**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| J&J SPORTS PRODUCTIONS, INC. | CIVIL ACTION |
| VERSUS | 15-617-SDD-EWD |
| MADRID NIGHT CLUB L.L.C.<br>f/k/a AUSTIN J'S ENTERPRISE, L.L.C.<br>AND GHOLAM R. OTADI | |

**RULING**

Following the Final Pretrial Conference on August 22, 2017, the Court *sua sponte* ordered the Parties to provide supplemental memoranda in support of their *Motions for Summary Judgment* regarding Plaintiff's claim under 47 U.S.C. § 553 ("§ 553")[1] to aid the Court's reconsideration of its prior *Ruling*.[2] The Plaintiff, J&J Sports Productions, Inc. ("Plaintiff"),[3] and the Defendants, Madrid Night Club L.L.C., et.al. ("Defendants"),[4] have each provided a memorandum in support of their respective motions which the Court has considered. For the following reasons, the Defendants' motion on Plaintiff's § 553 claims will be GRANTED, and the Plaintiff's motion on its § 553 will be DENIED.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff claims that, on September 14, 2013, an investigator hired by Plaintiff observed the live broadcast of "The One" Floyd Mayweather, Jr. v. Saul Alvarez WBC Light Middleweight Championship Fight Program" ("the fight") at Madrid Nightclub

---

[1] 47 U.S.C. § 553(a)(1)(2006).
[2] Rec. Doc. 30.
[3] Rec. Doc. 34.
[4] Rec. Doc. 36.
40868

("Madrid"), a commercial establishment in Prairieville, Louisiana. Plaintiff alleges that it had the "exclusive nationwide commercial distribution and broadcast" of the fight.[5] Plaintiff further claims that Defendants, "with full knowledge that [the fight] was not to be intercepted, received, published, divulged, displayed, and/or exhibited by commercial entities…did unlawfully intercept, receive, publish, divulge, display and/or exhibit [the fight.]"[6] Plaintiff further alleges that the Defendants advertised their display of the fight by neon sign and on Madrid's Facebook page and charged a $5 admission fee to view the fight. Mr. Otadi ("Otadi"), per Plaintiff, is liable as manager of Madrid.

Defendants do not dispute that the fight was shown at Madrid on September 14, 2013. However, Defendants argue that they purchased a T.V. "business package" service through Eatel, the Defendants cable service provider, and paid Eatel a pay per view fee to watch the fight. Defendants claim that Eatel mistakenly failed to place Madrid in the hospitality category when Otadi ordered cable service for Madrid. Given these facts, Defendants contend that the safe-harbor provision of § 553 applies.

In its prior *Ruling*,[7] the Court granted in part and denied in part the Defendants' *Motion for Summary Judgment*[8] and denied the Plaintiff's *Motion for Summary Judgment*.[9] During the Final Pre-Trial Conference, held on August 22, 2017, the Plaintiff dismissed all of its remaining claims, excluding those previously dismissed in the Court's *Ruling*, [10] except for its claim under § 553. At the Final Pretrial Conference Plaintiff's

---

[5] Rec. Doc. 1, p. 8.
[6] *Id.* at p. 9.
[7] Rec. Doc. 27.
[8] Rec. Doc. 19.
[9] Rec. Doc. 13.
[10] Rec. Doc. 30.
40868

counsel stipulated that the Plaintiff was not pursuing any copyright infringement claims against the Defendants. Accordingly, the only issue remaining before the Court is the Defendants' liability, if any, under § 553, which both parties were ordered to brief.

## II. LAW AND ANALYSIS

### A. Reconsideration Standard

An interlocutory order denying a summary judgment motion "can be modified or rescinded by the Court, as justice requires, at any time before final decree."

Rule 54(b) provides that:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. *Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or rights and liabilities of fewer than all of the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.*[11]

Accordingly, under Rule 54(b), "a court retains jurisdiction over all the claims in a suit and may alter any earlier decision at its discretion until final judgment has been issued on a claim or on the case as a whole."[12] Because a final judgment has not been issued in this matter, Rule 54(b) allows the Court to reconsider its prior *Ruling*[13] on the *Motions for Summary Judgment* on Plaintiff's § 553 claims.[14] Having reconsidered the evidence and arguments of the parties, the Court finds that there is no genuine issue of material fact in

---

[11] Fed. R. Civ. Pro. 54(b)(emphasis added).
[12] *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 259 F.Supp.2d 471, 475 (M.D.La. 2002).
[13] Rec. Doc. 21.
[14] "Where, as here, a motion to reconsider concerns only interlocutory rulings, the appropriate vehicle for making the motion is [Federal Rule of Civil Procedure] 54(b)." *Livingston Downs Racing Ass'n*, 259 F.Supp.2d at 474-75.
40868

dispute, thus the matter is proper for summary determination as a matter of law.

### B. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[15] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[16] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the non-movant's case."[17] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[18] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[19]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[20] All reasonable factual inferences are drawn in favor of the nonmoving party.[21] However, "[t]he Court has no

---

[15] Fed. R. Civ. P. 56(a).
[16] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[17] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).
[18] *Rivera v. Houston Independent School Dist.*, 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[19] *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[20] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[21] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
40868

duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."²² "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"²³

### C. *J&J Sports Productions, Inc. v. Mandell Family Ventures, L.L.C.*

The Fifth Circuit examined liability under § 553 in *J&J Sports Productions, Inc. v. Mandell Family Ventures, L.L.C.*²⁴ In *Mandell*, the Plaintiff, J&J ("J&J"), claimed that the defendant, Green Avenue Pizza Company ("GAPC"), violated § 553. The alleged violation occurred when GAPC purchased a pay-per-view fight from its cable provider, Time Warner Cable ("TWC"), for $54.95 and displayed the fight in its restaurant.²⁵ In examining § 553, the *Mandell* court held:

> [§553(a)(1)] imposes civil and criminal liability for "interception or receiving any communications service offered over a cable system." 47 U.S.C. 553(a)(1)(2006). But it includes an essential exclusion, often referred to as a "safe harbor," that precludes the imposition of liability on the majority of cable recipients – customers of cable providers. This exclusion constrains the reach of the statute by excepting from liability those individuals who receive authorization from a cable operator.²⁶

The court in *Mandell* further held:

> The text of [§ 553] unambiguously states that the liability

---

²² *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
²³ *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249)).
²⁴ 751 F.3d 346, 347 (5th Cir. 2014).
²⁵ *Id.*
²⁶ *Id.* at 348.
40868

> extends only to the receipt of a cable services *not authorized by a cable operator*. Therefore, in order for a cable customer to ensure that it is not criminally or civilly liable under [§ 553], it need only receive authorization from a cable operator for the cable services it receives.[27]

The defendant in *Mandell* provided affidavits that it was authorized to receive the broadcast from TWC.[28] The same affidavits "show[ed] that the Defendant did not steal, intercept, or obtain the broadcast under false pretenses."[29] Because the defendant was able to prove that TWC: "(1) was aware that GAPC was a commercial establishment holding a commercial cable account, (2) sold the broadcast of the fight to GAPC for $54.95, and (3) affirmatively delivered the broadcast of the fight to GAPC via pay-per-view broadcast,"[30] the Fifth Circuit reversed the district court's ruling granting J&J's motion for summary judgment on its § 553 claims.[31]

Despite the Fifth Circuit's holding in *Mandell* regarding § 553 liability for customers of cable services, the Plaintiff argues that the Court is not bound by *Mandell*.[32] Plaintiff submits that "[w]hat is troubling about *Mandell* is the [c]ourt's general statement that the 'safe harbor' would in most instances apply to 'customers of cable providers.' J&J argues that the statement can only be dicta and it should not be a table upon which courts write when the facts are significantly different."[33] The portion of *Mandell* referred to as dicta by the Plaintiff reads:

"But [§ 553] includes an essential exclusion, often referred to as a 'safe harbor,' that

---

[27] *Id.*
[28] *Id.* at 350.
[29] *Mandell*, 751 F.3d at 350 (5th Cir. 2014).
[30] *Id.*
[31] *Id.*
[32] Rec. Doc. 34, p. 2.
[33] *Id.*
40868

precludes the imposition of liability on the majority of cable recipients – customers of cable providers."[34] The Fifth Circuit in *U.S. v. Segura* defined dictum as follows:

> A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it. A statement is not dictum if it is necessary to the result or constitutes an explanation of the governing rules of law.[35]

The challenged language in *Mandell* is an explanation of § 553, the law governing the case, which the court analyzed and applied to the facts of the case.[36] Based upon the Fifth Circuit's definition of dictum in *U.S. v. Segura*, the Court finds that the disputed passage is not dictum. Accordingly, the Court will apply the Fifth Circuit's holding in *Mandell* and the Court considers instructive the Fifth Circuit's view that the safe harbor provision of § 553, as written by Congress, applies to the majority of cable recipients, customers of cable providers.

The Defendants in the present case purchased a business cable account from Eatel.[37] Toby Dubois ("Dubois"), an Eatel employee, testified in his deposition that the Defendants' cable package was classified as a regular business account, not a hospitality account.[38] Dubois testified that the Defendants were billed for the fight, the fight was delivered via a pay-per-view broadcast, and the purchase was applied to the Defendants' bill.[39] Accordingly, the Defendants have established with summary judgment evidence that they had a commercial business account with Eatel, they were billed for the fight in

---

[34] *Mandell*, 751 F.3d at 348 (2014).
[35] 747 F.3d 323, 328 (5th Cir. 2014).
[36] *Mandell*, 751 F.3d at 348-50 (2014).
[37] Rec. Doc. 15-3, p. 32, ll. 12-25, p. 33, l. 1-4., pp. 41-44, pp, 45-49, p. 53.
[38] *Id.* at p. 23, ll. 11-18.
[39] *Id.* at p. 32, ll. 6-11.
40868

question, and Eatel delivered the fight via pay-per-view broadcast.[40] Per *Mandell*, the Defendants are entitled to the safe harbor provision of § 553; however, the facts of the present case require the Court to perform further analysis before determining if § 553's safe harbor provision applies.

Briefly turning to the factual background, the evidence before the Court indicates that the Defendants' original business account with Eatel, per the ILEC agreement, was under an account for Southbay Autoplex.[41] The Defendants later ordered a regular business cable package for Madrid, which appeared under the same account as Southbay Autoplex, but at a separate address.[42] When asked in his deposition if "Eatel sort of takes the lead in deciding whether a customer goes into the hospitality category or the regular category?",[43] Dubois replied: "Yeah. That would be typically based on the feedback from the customer, like the type of business that it is, what the commerce is and what they're doing, and that's how it gets assigned whether it's hospitality or not."[44] When specifically asked if he had "any records of anybody contacting Otadi saying 'what business are you in at those two different addresses?'", Dubois replied, "Again, not that I'm aware of, no."[45]

The key factual distinction between *Mandell* and the present case is the type of commercial cable service the respective defendants received. In *Mandell*, it was not disputed that GAPC was correctly classified by TWC as a restaurant and received the

---

[40] *See supra* notes 38-40.
[41] Rec. Doc. 15-3, pp. 41-44.
[42] *Id.* at p. 26, ll. 13-25, p. 27, ll. 1-14.
[43] *Id.* at p. 33, ll. 6-9.
[44] *Id.* at p. 33, ll. 10-14.
[45] *Id.* at p. 29, ll. 17-21.
40868

appropriate cable service from TWC. Here, the Plaintiff argues that the safe harbor provision does not apply because Defendants were regular business customers, not hospitality business customers, and received the pay-per-view fight in question as regular business customers.[46] The Defendants argue they are not liable for Eatel's internal misclassification because they had no contractual or statutory duty to ensure that Eatel correctly designated its business at the second address as a hospitality commercial account.[47] Accordingly, the question before the Court is whether the contract or § 553 obligated the Defendants to disclose that the second address under the Southbay Autoplex account was for Madrid, a nightclub.

### D. The Contract

The Plaintiff argues that the contract between the Defendants and Eatel obligated the Defendants to disclose that the second address was a nightclub.[48] Plaintiff relies on the ILEC Service Agreement[49] ("ILEC agreement"),[50] the "Terms & Conditions: TV Service for Business" ("Terms & Conditions"),[51] and the document entitled "Customer Information: Your privacy rights as EATEL Customer and other information" ("Customer Information document"),[52] in support of its argument.[53] Specifically, the Plaintiff relies on the "Agreement of Parties,"[54] "Use,"[55] "No Additional Promises or Unauthorized

---

[46] Rec. Doc. 34, p. 4.
[47] Rec. Doc. 37-1, p. 6-10.
[48] Rec. Doc. 34, pp. 5-7.
[49] "The validity, construction, and performance of this agreement shall be construed in accordance with the laws of the State of Louisiana." Rec. Doc. 15-3, p. 43.
[50] Rec. Doc. 15-3, pp. 41-44.
[51] *Id.* at pp. 45-49.
[52] *Id.* at pp. 50-51.
[53] Rec. Doc. 34, pp. 4-7.
[54] Rec. Doc. 15-3, p. 43.
[55] Rec. Doc. 15-3, p. 43.
40868

Modifications,"[56] and "Assignments"[57] provisions of the ILEC agreement, and the "Programming Service" provision of the Terms & Conditions in support of its contractual duty argument. While the Plaintiff generally references these provisions of the ILEC agreement and Terms & Conditions, it points to no specific language that required the Defendants to disclose that the second address was a nightclub. After reviewing the ILEC agreement, Terms & Conditions, and the Customer Information document, the Court finds no language to support the Plaintiff's claim that the Defendants had a contractual duty to disclose that the second address on the account was a nightclub. Furthermore, there is no summary judgment evidence that Otadi was asked any descriptive information about the business cable services he ordered, or that he made any misrepresentations to hide the nature of the business in order to obtain any rate advantage.

As the Louisiana Supreme Court has held: "Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law."[58] In *Olympia Minerals, LLC. v. HS Resources, Inc.*, the Louisiana Supreme Court held, "[] when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate."[59] Dubois's unsupported testimony about what "should have been done"[60] is of no moment given that the Defendants had no contractual duty to disclose that the nature of the business at the

---

[56] Rec. Doc. 15-3, p. 44.
[57] *Id.*
[58] *Olympia Minerals, LLC. V. HS Resources, Inc.*, 13-2637, 13-2717 (La. 10/15/14); 171 So.3d 877, 878.
[59] 13-2637, 13-2717 (La. 10/15/14); 171 So.3d 878, 895.
[60] "So the thing that we would, that I would say should have been done here is when the business changed its purpose or function and it was a bar and restaurant, then that would have changed the type of service that was delivered and it changed the fee structure as well, then this wouldn't have occurred, right, so that the fight wouldn't have been able to be purchased." Rec. Doc. 15-3, p. 32, ll. 22-25, p. 33, ll. 1-4.
40868

second address, Madrid, was a nightclub.

### E.  § 553 Authorization

Plaintiff argues that the Defendants were not authorized to display the fight because of Eatel's misclassification of the Defendants' business. The Plaintiff's argument places the onus on the Defendants to ensure that Eatel correctly categorized their business. The Fifth Circuit in *Mandell* examined whether commercial cable customers are obligated under § 553 to ensure that cable service providers are authorized to display programs they receive.[61]

In *Mandell*, J&J argued that the defendant should have taken additional steps to ensure that TWC was authorized to deliver the pay-per-view fight.[62] "J&J's argument, in essence, is that a cable customer who receives such authorization may still face liability under § 553(a)(1), it need only receive authorization from a cable operator for the cable services it receives."[63] The Fifth Circuit rejected J&J's argument, holding:

> Interpreting the safe harbor in this highly restrictive manner finds no support in the text of the statute. The statute does not hinge liability on the cable customer taking additional steps or the cable operator being licensed to distribute a broadcast: The exclusion from liability simply applies to those who receive authorization from a cable operator.[64]

Here, the Plaintiff argues that the Defendants were not authorized to show the fight to nightclub patrons because they did not purchase the fight under a hospitality account. According to the Plaintiff's argument, the Defendants are required under § 553 to contact Eatel and confirm that they were classified as hospitality customers to ensure that they

---

[61] *Mandell*, 751 F.3d at 348 (2014).
[62] *Id.*
[63] *Id.*
[64] *Id.* at p. 348-49.
40868

were authorized to receive the fight – Plaintiff's argument is contrary to the holding of *Mandell*. The Fifth Circuit clearly stated in *Mandell* that § 553 does not require cable customers "to take additional steps" to ensure that the cable providers are authorized to distribute a program.[65] If cable customers are not required to verify the cable provider's authority to deliver programming, *a fortiori*, a cable customer cannot be held to a duty to verify that the cable provider properly classifies their category of service.

There is no evidence before the Court that the Defendants stole, intercepted, or obtained the fight under false pretenses. The Defendants have provided summary judgment evidence that: 1) Eatel was aware that the Defendants operated a commercial establishment holding a commercial cable account;[66] 2) Defendants ordered the fight as business customers and were billed and paid for the fight as business customers;[67] and 3) received the fight to the business via pay-per-view broadcast.[68] Accordingly, the Court finds that the safe harbor provision of § 553 applies to the Defendants per *Mandell*.

---

[65] *Id.*
[66] Rec. Doc. 15-3, p. 32, ll. 12-25, p. 33, l. 1-4.
[67] *Id.* p. 32, ll. 1-11.
[68] *Id.* at p. 31, ll. 6-24.

40868

### III. CONCLUSION

For the reasons stated above, Plaintiff's *Motion for Summary Judgment* on its § 553 claim is DENIED,[69] and Defendants' *Motion for Summary Judgment* on Plaintiff's § 553 is GRANTED.[70]

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on September 1, 2017.

_____
**JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[69] Rec. Doc. 13.
[70] Rec. Doc. 19.
40868